UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Gregory T. Hitchcock,

        Plaintiff,

vs.

Consolidated Precision Products Corp.,
a Delaware corporation,
Industrial Growth Partners II, L.P.,
a Delaware limited partnership,
Consolidated Foundries Holdings Corp.,
a Delaware corporation, and
ABC Corporation, John Doe and/or
Mary Roe,

        Defendants.

Jurisdiction – Diversity

Case No.: *08-940JNE/JJG*

**VERIFIED COMPLAINT**
(JURY TRIAL DEMANDED)

Plaintiff, for his cause of action, states and alleges as follows:

1.      The Plaintiff Gregory T. Hitchcock ("Hitchcock") is an adult citizen of the State of Minnesota.

2.      Defendant Consolidated Precision Products Corp. ("Consolidated") is a Delaware corporation having its principal place of business in the State of California.

3.      Industrial Growth Partners II, L.P. ("Industrial") is a Delaware limited partnership having is principal place of business in the State of California.

4.      Consolidated Foundries Holdings Corp. ("Holdings") is a Delaware corporation having its principal place of business in Delaware.

5.      ABC Corporation, John Doe and/or Mary Roe is or are the as yet unidentified purchaser or purchasers of Holdings.

**SCANNED**

APR 0 3 2008

U.S. DISTRICT COURT MPLS

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant 28 U.S.C. §1332.  Venue in

this Court is appropriate under 28 U.S.C. §1391(2) and (3), and under the terms of the contract

that is the subject of this action, a *Stockholders Agreement* dated May 23, 2006, ("Agreement"),

which provides at ¶27:

> The parties agree that all disputes, legal actions, suits and
> proceedings arising out of or relating to this Agreement must be
> brought exclusively in a federal district court located in
> Minneapolis, Minnesota.  Each party hereby consents and submits
> to the exclusive jurisdiction of such courts.  No legal action, suit or
> proceeding with respect to this Agreement may be brought in any
> other forum.  Each party hereby irrevocably waives all claims of
> immunity from jurisdiction and any right to object on the basis that
> any dispute, action, suit or proceeding brought in such court has
> been brought in an improper or inconvenient forum or venue.

## BACKGROUND AND GENERAL ALLEGATIONS

7.     Hitchcock, Consolidated and Industrial are parties to the Agreement, which

concerns the ownership of Hitchcock Industries, Inc. ("New HII").  Hitchcock is the sole

minority shareholder of New HII.  Consolidated is the sole majority shareholder.

8.     New HII is a subsidiary of Consolidated.  Consolidated is a unit of Holdings.

Upon information and belief, Industrial is the either the sole shareholder in Holdings or a holder

of the vast majority of shares in Holdings.  Consolidated is listed on Industrial's website

(www.igpequity.com) as being in Industrial's "Portfolio of Companies."  One of Industrial's

partners or employees sits on the Board of Directors of Consolidated and two of Industrial's

partners or employees sit on the Board of Directors of New HII.

9.     This action is the result of Industrial's, and consequently, Consolidated's and

Holding's, willful refusal to abide by the terms of the Agreement and otherwise fulfill their

duties and obligations to Hitchcock.

10.     Hitchcock's grandfather, Ralph Hitchcock, started the former Hitchcock Industries, Inc. ("HII") in 1916 in Minneapolis. At that time, HII manufactured parts and components for the fledging automotive manufacturing industry. Over the years, HII grew and developed into a supplier of aerospace components to the civilian and defense aerospace industry. The business stayed in the family, with Hitchcock's father, Carlton Hitchcock, taking over from Hitchcock's grandfather in 1965, and Hitchcock taking over from his father and becoming HII's Chief Executive Officer and Chair of the Board of Directors in 1985.

11.     In 2005, certain events forced HII into a Chapter 11 bankruptcy proceeding, during which it was determined that the most feasible means of paying all creditors of HII was to sell the company. With Bankruptcy Court approval, an auction was conducted. Industrial, along with Consolidated, formed a company called HI Acquisition Corp., a Delaware corporation, which was the successful bidder at the auction. HI Acquisition Corp. purchased virtually all the assets of HII, including the corporate name. HI Acquisition Corp. then changed its name, to Hitchcock Industries, Inc. (New HII). As part of the transaction, Hitchcock became the owner of seventeen percent (17%) of the shares in New HII, and is the sole minority shareholder. Consolidated owns the balance of the outstanding shares of New HII, and is the sole majority shareholder.

12.     As part of the auction, Consolidated and Industrial proposed a draft "Stockholders Agreement" which was, as noted above, entered into on May 23, 2006. A true and correct copy of the signed Agreement is attached hereto as Exhibit A.

13.     The Agreement provides that Delaware law shall apply to "[a]ll issues and questions concerning the construction, validity, interpretation and enforceability" of the Agreement, without regard to Delaware's choice of law or conflict of laws rules, and further

3

provides that "each of the parties rights and obligations" under the Agreement shall be subject to the requirements of Delaware law. The Agreement also provides at Section 18:

> Remedies. The Company and each Stockholder shall be entitled to enforce their rights under this Agreement specifically, to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights existing in their favor. The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that the Company and Stockholder may in his, her or its sole discretion apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive relief (without posting a bond or other security) in order to enforce or prevent any violation of the provisions of this Agreement.

14.     In the Agreement, Hitchcock is referred to as the "Other Stockholder", Industrial is referred to as "IGP" and Consolidated is referred to as "Investor." New HII was also a signer of the Agreement and is referred to as the "Company." Further, the Agreement defines the term "Holdings" to mean "Consolidated Foundries Holdings Corp., a Delaware corporation and parent company of [Consolidated]." Finally, the term "Shares" is defined in the Agreement, in relevant part, to be the common stock of New HII.

15.     Under the Agreement, Hitchcock became a member of the Board of Directors of New HII, but Hitchcock did not remain as an officer or employee of the company. Hitchcock has no role in the day to day operations of New HII.

16.     The Agreement, among other things, limits Hitchcock's right to transfer his shares of New HII. It also addresses, in Section 4 (titled "Approved Sale"), the parties' rights and obligations in the event upon a "Sale of Holdings" or a "Sale of the [New HII]." For example, the Agreement provides conditions for Hitchcock's consent to a sale of Holdings. Section 4(a) of the Agreement provides, in relevant part, as follows (emphasis in original):

> If the holders of a majority of the Holdings Shares approve a Sale of Holdings…, each holder of Shares shall vote for, consent to and

4

> raise no objections against such Approved Sale and shall waive
> any dissenters rights, appraisal rights or similar rights in
> connection therewith; <u>provided</u> that such holders of Shares shall
> not be obligated to so vote, consent, raise no objection or waive
> any such rights in the case of an Approved Sale to a Person that is
> not an Independent Third Party unless the terms and conditions of
> such sale comply with the other conditions in this Section 4 and are
> on an "arms length basis." If the Approved Sale is structured as a
> sale of Shares or Holdings Shares, each holder of Shares shall
> agree to sell all of his, her or its Shares or right to acquire Shares
> on the terms and conditions approved by the holders of a majority
> of the Investor Shares or Holdings Shares, as applicable, subject to
> Section 4(b) and (c) below.

17.     The Agreement also sets the minimum amount that Hitchcock would receive upon

a sale of Holdings and refers to a formula for determining that minimum amount. The formula

requires that Hitchcock be provided with information regarding both New HII and regarding the

terms and conditions of the sale of Holdings. Section 4(b) of the Agreement provides as follows

(italics supplied):

> Upon consummation of the Approved Sale involving a Sale of
> Holdings, each Other Stockholder *shall be entitled to receive* in
> exchange for the Shares held by such Other Stockholder an
> aggregate amount *not less than* the Sale Amount and otherwise on
> the same terms and conditions as are payable to the holders of
> Holdings Shares.

18.     The term "Sale Amount" is defined in the Agreement and requires an analysis of

New HII's "EBITDA" (earnings before interest, taxes, depreciation and amortization) and the

debt of New HII. Section 11 of the Agreement includes the following definition:

> "<u>Sale Amount</u>" means the fully diluted pro rata ownership interest
> of the participating Other Stockholder in the Company multiplied
> by the excess of (a) the product of (x) 6 (six) and (y) the
> Company's EBITDA for the 12 month period ending on the last
> day of the full calendar quarter immediately preceding the
> Approved Sale or the IGP Event, as applicable, over (b) the
> Indebtedness of the Company as of such date.

19.     Section 26 of the Agreement provides as follows (italics supplied):

> Further Assurances.   The parties shall execute and deliver all documents, *provide all information,* and *take or refrain from taking such actions as may be reasonably necessary or appropriate to achieve the purposes of this Agreement.*

20.     On January 16, 2008, Hitchcock received an email from Eric Heglie of Industrial. The email is attached hereto as Exhibit B.  In the email, Mr. Heglie states, in part:  "IGP is selling its stake in CPP [Consolidated] and as such will require you to execute several documents which will provide liquidity for your minority ownership in Hitchcock per our agreements in 2006."  The email also had several attachments, all set up for Hitchcock's signature, but not signed by any other person.  The attachments were a "Termination Agreement" (labeled "JD Draft of January 1, 2008"), attached hereto as Exhibit C, a "Release" (also labeled "JD Draft of January 1, 2008"), attached hereto as Exhibit D, a document titled "Action by Unanimous Written Consent of the Board of Directors," attached hereto as Exhibit E, a document titled "Stock Power," attached hereto as Exhibit F, a "Resignation," attached hereto as Exhibit G, and a document titled "Hitchcock Payment Calculation" (labeled "Draft"), attached hereto as Exhibit H.

21.     The documents attached to the email indicated that the shareholder(s) of Holdings had entered into, or were contemplating entering into, an agreement with an unidentified third party for the sale/purchase of all the shares of Holdings.  No details of any kind were provided to Hitchcock in the email or the attachments.  For example, the Termination Agreement, under which Hitchcock was supposedly being asked to terminate the Agreement in advance of the contemplated sale of the shares of Holdings, contained the following (emphasis and blanks in original):

6

WHEREAS, pursuant to that certain Stock Purchase Agreement (the *"Purchase Agreement"*), dated as of _____ \_\_\_, 2008, by and among Consolidated Foundries Holdings Corp., a Delaware corporation (*"Holdings"*), the stockholders of Holdings set forth on the signature pages thereto (the *"Sellers"*) and **[Buyer]**, a _____ corporation (*"Buyer"*), the Sellers desire to sell to the Buyer and the Buyer desires to purchase from the Sellers, all of the outstanding shares of common stock, par value $.01 per share, of Holdings;

22.     The email did not attach the "Stock Purchase Agreement" referenced in the language quoted in paragraph 21 above.

23.     The draft "Hitchcock Payment Calculation" attached to the email indicated that Hitchcock would receive $1,825,100.80[1] for his seventeen percent (17%) of New HII, an amount which Mr. Heglie, in the accompanying email, described as "preliminary and subject to change based on final purchase price." *See* Exhibits H and B.  In return for that sum, Hitchcock was apparently being asked, without explanation, to terminate the Agreement, release any claims he may have had against the defendants and New HII as a precondition to receiving the payment for his shares, transfer his stock power to some unidentified person or entity, resign as a director of New HII, and consent, as a director, to the signing of the "Termination Agreement" and ratify all past and future actions of New HII's officers.

24.     Industrial has been, at all times, the entity engaged in dealing with Hitchcock. Despite repeated requests and demands, Consolidated and Industrial have refused, and continue to refuse, to provide Hitchcock with information necessary to determine whether Consolidated and/or Industrial is complying with their respective obligations under the Agreement, what terms and conditions of the Agreement might apply to the mysterious sale of Holding's shares, and to calculate the amount Hitchcock would be entitled to receive above the minimum amount called for in the Agreement.  Further, Industrial, in proposing a "Sale Amount" to Hitchcock, has

---

[1] Defendants have recalculated the amount and under their formula allege Hitchcock is entitled to $2,000,487.40.

included amounts in the formula which are improper and inaccurate, which result in a substantially reduced "Sale Amount" to the detriment of Hitchcock. As one example, Industries is attempting to force Hitchcock to pay a portion of the "management bonuses" of $15-20 million that management will receive, improperly describing such bonuses as a "transaction cost" related to closing the sale.

25.     Hitchcock is informed and believes that the sale of Holdings is proceeding, with or without his consent, and may be consummated in the near future.

26.     Hitchcock is informed and believes, based on limited knowledge as to New HII's financials, that application of the Sale Amount formula in the Agreement would result in a minimum amount payable to Hitchcock upon a sale of Holdings of $6,600,000.00. As a result of the Industrial's refusal to provide any information regarding the terms of the sale of Holdings, Hitchcock currently does not know how much Industrial, as the owner of Holdings, will be receiving upon the sale of Holdings. However, based on very limited information provided by Industrial, Hitchcock believes that his shares in New HI would be valued at approximately $15,000,000.00 under the sale of Holdings. To date, Industrial has proposed to pay Hitchcock $2,000,000.00, but only after Hitchcock has signed a release and other documents which would result in a waiver of all further rights of Hitchcock.

## COUNT I
## BREACH OF CONTRACT

27.     Paragraphs 1 through 26 above are incorporated herein.

28.     The Agreement requires Consolidated and Industrial to "provide all information" and to take or refrain from taking actions as "may be reasonably necessary or appropriate to achieve the purposes" of the Agreement.

29.     Consolidated and Industrial have, together and separately, breached the Agreement by, among other things, failing and refusing to provide Hitchcock with all information necessary for Hitchcock to determine his rights under the Agreement, including the amount he is entitled to for his shares of New HII.

30.     As a direct and proximate result of Consolidated's and Industrial's breaches of the Agreement, Hitchcock has and will continue to suffer damages in an amount estimated to be between $6.6 and $15 million dollars, to be ultimately proved at trial.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**

31.     Paragraphs 1 through 30 above are incorporated herein.

32.     Consolidated, as the sole majority shareholder of New HII, owes fiduciary duties to Hitchcock, as the sole minority shareholder, including the duty to provide Hitchcock with full and complete information necessary to Hitchcock's ability to make informed decisions regarding the sale of his shares in New HII and the duty to avoid taking action that is detrimental to Hitchcock's interests. Industrial, by virtue of its control over Consolidated, owes the same duties to Hitchcock.

33.     Industrial and Consolidated, in failing and refusing to provide Hitchcock with information regarding the terms and conditions of the sale of Holdings and in pursuing a sale of Holdings and, thus, New HII, without the informed consent and participation of Hitchcock, has, and is continuing to, breach its fiduciary duties to Hitchcock.

34.     As a direct and proximate result of Industrial's and Consolidated's breaches of fiduciary duty, Hitchcock has suffered damages in an amount estimated to be between $6.6 and $15 million dollars, to be ultimately proved at trial.

9

## COUNT III
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

35.    Paragraphs 1 through 36 above are incorporated herein.

36.    Industrial, acting with effective control over New HII and Consolidated, by failing and refusing to provide Hitchcock with information regarding the sale of Holdings, has, and continues to, aid and abet Consolidated in Consolidated's breach of fiduciary duties owed to Hitchcock.

37.    As a direct and proximate result of Industrial's aiding and abetting of Consolidated's breaches of fiduciary duty Hitchcock has been damaged in an amount estimated to be between $6.6 and $15 million dollars, to be ultimately proved at trial.

## COUNT IV
## BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

38.    Paragraphs 1 through 37 above are incorporated herein.

39.    The Agreement gave rise to an implied covenant of good faith and fair dealing between Hitchcock, Consolidated and Industrial and, therefore, Consolidated and Industrial owe a duty of good faith and fair dealing to Hitchcock in connection with the Agreement.

40.    Consolidated and Industrial, in failing and refusing to provide Hitchcock with full and complete information necessary for Hitchcock to determine and exercise his rights under the Agreement and make an informed decision regarding the sale of his shares in New HII, have each breached their duties of good faith and fair dealing owed to Hitchcock.

41.    As a direct and proximate result of Consolidated's and Industrial's breaches of duty, Hitchcock has been damaged in an amount estimated to be between $6.6 and $15 million dollars, to be ultimately proved at trial.

## COUNT V
## INTERFERENCE WITH CONTRACT

42.     Paragraphs 1 through 41 above are incorporated herein.

43.     The Agreement is a valid and enforceable contract between Hitchcock, Consolidated, Industrial and New HII.

44.     Holdings, owned in whole or in part by Industrial, has knowledge of the Agreement and the rights, obligations, duties of, and benefits to, the parties to the Agreement, including the obligations of Consolidated and Industrial to provide information to Hitchcock.

45.     Holdings, the purported "seller" in the undisclosed transaction that is triggering the provisions of the Agreement, has knowingly and intentionally induced or caused Consolidated's and Industrial's breaches of the Agreement, including the refusal to provide information to Hitchcock.

46.     As a direct and proximate result of Holding's interference, Hitchcock has been damaged in an amount estimated to be between $6.6 and $15 million dollars, to be ultimately proved at trial.

## COUNT VI
## ACCOUNTING/PRODUCTION OF INFORMATION

47.     Paragraphs 1 through 48 above are incorporated herein.

48.     The Agreement provides that the parties will "deliver all documents, provide all information, and take or refrain from taking such actions as may be reasonably necessary or appropriate to achieve the purposes of this Agreement."

49.     The Agreement also provides that any shareholder of New HII may seek specific performance to enforce his or her rights or prevent a violation of the Agreement.

50.     Consolidated and Industrial, by failing and refusing to provide Hitchcock with the information necessary to determine his rights under the Agreement are willfully preventing his exercise of those rights and are violating, and will continue to violate, the Agreement and are frustrating the purposes of the Agreement.

51.     Hitchcock is entitled to an order of specific performance requiring that Consolidated and Industrial turnover to Hitchcock all documents and information necessary for Hitchcock to determine and exercise his rights under the Agreement, including, but not limited to, full and complete information relating to the sale of the Holding's shares, including complete and unredacted copies of any and all agreements with the buyer of those shares.

**COUNT VII**
**INJUNCTIVE RELIEF**

52.     Paragraphs 1 through 51 above are incorporated herein.

53.     The Agreement provides that any shareholder of New HII may seek injunctive relief in order to enforce his or her rights under the Agreement and/or prevent a violation of the Agreement. (See paragraph 18 of Exhibit A.)

54.     The Agreement provides that Hitchcock has certain rights upon a sale of shares in Holdings under an "Approved Sale" and those rights are, among other things, dependent upon whether the sale is to an "Independent Third Party," as that term is defined in the Agreement, upon whether the sale is being made at "arms length," upon a calculation of the "Sale Amount" as that term is defined in the Agreement, and the terms and conditions under which Industrial and/or Consolidated are paid for their shares in Holdings.

55.     Industrial, Consolidated and Holdings have failed and refused to provide information necessary for Hitchcock to determine his rights under the Agreement and Industrial and Consolidated have indicated an intention to violate the terms of the Agreement by, among

12

other things, indicating an intention to prevent Hitchcock from receiving what he is entitled to under the terms of the Agreement.

56.     Upon information and belief, due to the limited information provided by Industrial, the total sale price being negotiated between Holdings and the as yet unidentified buyer is approximately $280,000,000, and the sale of New HII represents approximately $70,000,000 of that total amount.

57.     Hitchcock is entitled to an injunction, without the requirement of a bond or other security, requiring that Industrial, Consolidated, Holdings, ABC Corporation, John Doe and Mary Roe place the Holding's sale proceeds attributable to the sale of New HII in the amount of $70,000,000, in escrow and preventing distribution of those proceeds to any party until such time as the Defendants have provided Hitchcock with all information necessary for him to determine and exercise his rights under the Agreement and the Court has determined the amount which Hitchcock is entitled receive under the Agreement.

**WHEREFORE**, Plaintiff respectfully requests that the Court order and order the entry of judgment as follows:

1.     Enjoining Defendants, without bond or other security, from distributing the proceeds from the sale of the shares of Holdings that would be attributable to the sale of New HII, $70,000,000, and requiring that those proceeds be held in escrow until such time as Defendants have provided Hitchcock with all information necessary for him to determine and exercise his rights under the Agreement and the Court has determined the amount which Hitchcock is entitled receive under the Agreement;

2.     Requiring that Industrial, Consolidated and Holdings immediately turnover to Hitchcock all documents and information necessary for him to determine and exercise his rights

under the Agreement, including but not limited to complete copies of the purchase agreement and all financial terms of the purchase of Holding's shares.

3.      Awarding damages to Hitchcock and against Consolidated, Industrial and Holdings, jointly and severally, in an amount estimated to be between $6.6 and $15 million dollars, to be ultimately proved at trial;

4.      Awarding to Hitchcock his reasonable costs, expenses and disbursements herein, including reasonable attorney's fees; and

5.      Granting such other and further relief as the Court deems just.

                        **LEONARD, O'BRIEN,**
                        **SPENCER, GALE & SAYRE, LTD.**

Dated: April 3, 2008              By: _____
                                     Brian F. Leonard, #62236
                                     bleonard@losgs.com
                                     Thomas C. Atmore, #191954
                                     tatmore@losgs.com
                                     Jennifer K. Eggers, #244582
                                     jeggers@losgs.com

                                     100 South Fifth Street, Suite 2500
                                     Minneapolis, Minnesota 55402
                                     Telephone: (612) 332-1030
                                     Facsimile: (612) 332-2740

                                     ATTORNEYS FOR GREGORY T. HITCHCOCK

## **VERIFICATION**

I, Gregory T. Hitchcock, the Plaintiff named above, under penalty of perjury, state that the factual information contained in this Verified Complaint is true and correct to the best of my information and knowledge.

Dated: April __l__ , 2008

Gregory T. Hitchcock

376480